In this case, the board made three errors. The first error was it misinterpreted the 690 patent as merely claiming a web WAN front end for the prior art relational databases. The second error the board committed was accepting the hearsay declaration of Mr. Neuber as substantial evidence of the publication. Can I ask you, what is your claim, how would you construe web enabled? Your Honor, the web enabled is defined at columns 4, line 66, through column 5, line 3. Web enabled requires that the web functionality be integrated into the database as part of a single database scheme, so that depending on authorization, every part of the database can be accessed remotely on the web, and changes in data are automatically reflected throughout the database. The board erroneously interpreted the 690 patent as being merely a web front end to a relational database. It erroneously accepted the hearsay declaration of Mr. Neuber on publication of R33.OE. How is it hearsay? Oh, if I may, Your Honor. Let me rephrase that. How is it not a business exception? Because, Your Honor, we're not dealing with whether 3.OE is or is not a genuine document. We're dealing with the issue of whether 5,000 copies of 3.OE were allegedly distributed, and therefore... He keeps that information in the normal course of his business, does he not? He does not, if I may, Your Honor. To begin with, if Your Honor looks at paragraph 19 of Mr. Neuber's declaration... Give me a page reference. Of course, it's A-18-572. Okay, if I may. According to a review, he doesn't say whose review, of SAP AG records, he doesn't say what records, Over 5,000 upgrades of R3 system release 3.OE, each of which contained the R3 system release 3.OE online documentation, were shipped by SAP beginning on September 16, 1996, and prior to December 22, 1996. He doesn't say who made this review. He doesn't say what documents were reviewed. And as we stated in our brief, as far back as the Supreme Court's decision in Barb Wire, and your predecessor's decision in Ray Wire, W-Y-E-R, there has to be some confirmation for these hearsay statements. In addition, if Your Honor will notice, at the bottom of the declaration before the signature, this is hardly the typical declaration under 1746. Instead, it uses a patent office form, which says, I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true. And it goes on to say that the undersigned recognizes that if they're making a misstatement, it might jeopardize the undersigned's patent application. This is clearly a hearsay declaration. We don't know who reviewed what SAP records. This is SAP AG, a German company. This isn't SAP USA. So the entire foundation for the Board's decision was a hearsay declaration that doesn't identify who looked at what records, much less identify any sample of those records. And as we try to argue to the Board and to this Court in our briefs, this violates due process. It takes property based on hearsay. But more importantly, from our point of view, there isn't substantial evidence to confirm. And this Court... Can I ask you, because I'm a little confused about whether you're arguing solely that we shouldn't allow the Board to rely on hearsay or that reliance on hearsay is a constitutional violation. What we're saying is that the Board should not have relied on hearsay that is not confirmed. As a matter of law or in this case? In this case. So you agree that the Board is not bound by the rules of evidence here? Correct. We try to make that clear in our... And so it's up to the Board whether or not to admit hearsay? It's not up to the Board. Each case... Well, who is it up to then? This reviewing Court. Well, isn't it initially up to the Board whether to admit this document or not? Absolutely. And they did? They did. They made that decision and we submit that was an error. You submit that's an abuse of discretion, right? Because that's the standard. Correct. It was an abuse of discretion and we say... How does that relate to your constitutional argument? Why do you need a constitutional argument? If it's an abuse of discretion, it's an abuse of discretion. The Constitution... Let me ask you this. I don't want to take up too much of your time. Assume that we don't find an abuse of discretion, how do you have a separate due process argument? The due process argument arises from the fact that we have property that has been taken away by unconfirmed hearsay. This is an administrative procedure. We understand that. We understand that the federal rules of evidence do not apply. But you disagree that the Board can rely on hearsay evidence if it properly exercises its discretion and that that wouldn't be a constitutional violation. So I don't see any light of day between us finding an abuse of discretion and you making some kind of due process argument. We believe that each case has to be looked at under its own circumstances. Here, because we have the unusual combination of a declaration... Let me ask you one more time. Let's say we find no abuse of discretion. Do you still argue that it's a due process violation, and if so, why? We argue it's a due process violation because we should not be deprived of our property based on uncorroborated hearsay statements, particularly when it's not even under proper oath under 1746. Well, you had notice, and you had an opportunity to respond, right? We had notice, but how does one respond? Do you go to Germany? Do you ask SAP to let you in the back door? Well, there were various corroborating documents that were also included, correct? There were corroborating documents. They wouldn't have to show for public use that there were 5,500 copies of these. They would really have to only show one, right? They would have to show that the document had been published to such an extent that it was available to all those skilled in the art who would be working in this area. The key is not with... I'm sorry. Really? Which includes, for example, somebody's doctoral thesis on file with one university. Yes, of course, that's true. The key thing here from our perspective is we're not disputing that 3.0e existed somewhere in SAP AG's computer somewhere in Germany. What we're disputing is there's not sufficient evidence that 3.0e was published and available to those people skilled in the art. The reason we say that is because we have a declaration that says it's signed under hearsay. As I said at paragraph 19, it doesn't say who reviewed it. It might have been Mr. Neuber, it might have been a lawyer, it might have been somebody else reviewed records. What we are saying is that is not sufficient to consider this as a publication and deprive the patent holder of its property. Now, we tried not to make that our lead argument in our brief. In the brief, what we said is even if your honors considered 3.0e, there was clear error here and the board improperly decided obviousness. What we argued was that the board misinterpreted the patent as just calling for a web front end for relational database. And that it also, I think we believe, clearly made error in interpreting 3.0e. 3.0e, as we tried to show in our briefs, was a hierarchical database. I believe we reproduced one of the figures at page 14 of our blue brief. You've got the graphical user interface on top, you've got applications down below, and then you have your database. So you have a clear three-tier hierarchy. If you compare that with Fig. 2 of the patent, which is the circular, not hierarchical, integrated database that is at the heart of this invention, you will see that the databases are different. And that what you have here is prior art that's multi-tier, an alleged invention that says everything is fully integrated into the same database. And if you look at R3, you've got a presentation service, an application service, and a database service. And that's shown at A12275. The key thing with having a hierarchical database, as opposed to the integrated single database schema that we claim in this invention, is shown at A12304, where in describing how R3 works, it states all data that is used across applications is stored at the client level. It's at the application level. Parts of customer and vendor master records are stored centrally. So part of the data is with the user and the applications. Part of it is in the database. At the same page, which we discuss at page 14 of the opening brief, it states every company area in the SAP system can define its own structure. The user must specify how each structure is derived from the others so that data can be transferred from one application to another. So instead of having all the data at the single database schema level, you have it distributed throughout the system with the users and at the application. And, again, that is laid out at A12304, which makes clear that data is not centrally stored and is therefore not available to users throughout the system. It depends on your program. Okay, can I take you back to web-enabled? What is your definition of web-enabled? Web-enabled, as I tried to say earlier, is defined at column 3, line 4. It's web-enabled requires the web functionality be integrated into the database, not like R3, as part of a single database schema So it's a database, a web-enabled database is a database that integrates web functionality. In the context of the invention, it talks about the various domains that have to be integrated into the database. It talks about products, payments, performance, and personnel. So the web-enabled database of the invention integrates the entire business, all four domains, and is integrated such that a change in any one part of the domains is automatically reflected in the other, which is quite different than what you have with R3. Okay, we're into, but why don't we save it and hear from the other side. May it please the court. As your honor, Judge Price, as you said, really, I think what the patent issue comes down to is the meaning of web-enabled. And it's the PTA's belief that web-enabled here is really referring to access. It's not referring to integration. When you look at the use of the term integration in the patent, it's referring to the single database schema. That's the part that's integrated. So you don't have one department keeping files here, another department here, another department here. There's one big database, and all of the different departments of the company are accessing it. That's the integrated portion. And importantly, that kind of integrated single database schema was exactly what was before the court when this court considered the reexamination of the 275 patent and affirmed the rejection of those claims to the database schema. As you'll note, well, you wouldn't note it because it's not before you, but in that case, there was also a web-enabled limitation, and that limitation wasn't appealed at all. It was conceded, effectively, that it was still anticipated by this very same reference, the SAP reference. Now when it came before the court a second time, they can't really appeal the database portion because that's already been addressed in the 275 case. So what they're addressing here is the web-enabled portion. What's the difference between web-enabled and web commerce? Are the two synonymous? I think web commerce is probably a slightly broader term, but I think web-enabled is really just referring to access, access to the program over the web, as they say. It facilitates telecommuting by employees. It allows people inside and outside the company to see the information in real time over the web. That's what the references in the patent, the very few references in the specification to the term web-enabled, seem to be getting at. And if they wanted a much more complicated technical definition of web-enabled that integrated it into the entire program, then one would expect that would be seen either in the specification or in the over 130 figures that are in this quite voluminous patent, and it's simply not taught. And as Your Honor alluded to with the reference to web commerce, even web commerce, presumably for purposes of bettering the patent's ability to capture infringing products and software, is defined very broadly, not even as the Internet, but just as some form of computer network. So we're talking about a very broadly defined claims and terms here that do not have the specific definition that Big Baboon has been attempting to imply here. So given this, the office's position is it makes perfect sense that with respect to the claims on appeal here, that the examiner and the board would look to the general disclosures of web commerce in the application and say, well, if really what we're getting down to is web access at a general level and not the guts of what the actual database is doing, that's enough to make the obviousness case. And in fact, if you look to the references cited by the board in its decision, and that's at A42 note 10, it says, yes, the examiner is looking to the general descriptions of web commerce, but look at these other references that the examiner used for other claims, more specific detail claims involving certain web components, and they show that you can take this exact database, the exact SAP 3.0 database was elevated to be integrated into having web access. This happened with the very prior art publication, that's an issue before the court. And in fact, if you look at, I'll just note a few pinpoint sites, at A12571 and A13018, SAP's own publication said basically with minimal changes, we were able to put our existing software and put parts of it on the web. And in one publication they said it took three weeks. So we're not talking about the kind of complicated technical solutions that Big Baboon seems to be implying. Can we move on to the Nuber declaration and the comments your friends made this morning in his brief? Yes, Your Honor. And his brief as well. One question that I had that he alluded to was the board seemed to rely, you rely on your brief, the fact that he has this thing at the end that he says that these statements could be subject to fine or imprisonment for lying, et cetera. Isn't that standard? I mean, why do we give that anyway? If somebody signs an affidavit and submits it to a government relation, a government agency, of course they're going to be subject to that. It seemed like people were relying on that as if that gave further credibility to what he was saying. Well, I think if we were operating under the federal rules, there's certain magic language that needs to be used in declarations and affidavits, and maybe that's what they were trying to get at here. But as Your Honor is stating, it's not the magic language in Paragraph 21 that matters. What matters is we're not dealing with a Rule 30b-6 corporate rep who just has been shown a bunch of documents and is swearing behind them. We're talking about somebody who worked at SAP for 16 years in the shipping department who himself saw the very software that we're talking about get shipped out the door with the more or less user manual. Well, in Paragraph 19, which seems to be the key paragraph, according to review of SAP AG records over 5,500 upgrades, blah, blah, blah. Were those attached? Were any records to support that statement attached to the declaration? There were records attached, samples, and that's right behind the declaration at A18576 and then 77 and 78 and 79. And it looks like what they did was they looked at these 5,000-plus records and they printed out from the database with unique numbers on each page copies of letters that were sent to their different customers, and each letter has a unique number associated with it. Now, it's not surprising that given the passage of time, they didn't have a photocopy of those exact documents, but they were able to find them electronically and print them out. So here are three or four examples of the kinds of information that was sent to the unique customers. And those documents say that not only was the software shipped, but the accompanying online manual was shipped with it. And that's really what this whole corroboration issue comes down to. I mean, there's no dispute that the SAP Software 3.0 was in wide distribution. There are references to the fact that it was in use by the Coca-Cola company in one of the corroborating documents attached that's in the record. So I think what we're getting to a little bit is form over substance. I mean, the software was distributed. It is very reasonable and consistent with Mr. Neuber's declaration that the user manual would be shipped with the very software that it's describing. It almost doesn't matter in the sense that what your opposing counsel seems to be arguing with is the numbers rather than the fact that things were shipped because the sworn declaration of a custodian of records says this is an example of what I shipped. That last paragraph says this is the number of them that were shipped, but it doesn't matter because he says, I shipped this letter. I sent this letter. We agree, and I do think that each case may depend on the facts, and if there was one letter ever issued and it was a very obscure, difficult to find situation, then yes, they might have a point. But here, you're right. I mean, whether it was 5,500 or 5,000 or 10. That was the question I asked your opposing counsel about obscure, difficult to find situations to wit doctoral theses, which are in a university record, and there's something on the Internet about them. Right. The point is it doesn't take much. I mean, it has to be publicly accessible. The bar is very low here, and the PTO has more than crossed it. Can you explain it? I get, and I think your contention is the rules of evidence don't strictly apply to these proceedings, and so the hearsay rule, although maybe instructive, doesn't have to be strictly applied. What's the space between the normal hearsay rule and what standard the board is going to use for reliability of evidence? Well, I think it's very much in the spirit of what the federal rules are getting at, although because it's an administrative proceeding, I think it's more flexible. I mean, the examiner and the board is really looking for hallmarks of reliability, and in fact, in some of the examples cited by counsel for Big Baboon, the board says, did it say draft on it? You know, were there conflicting dates on the documents? Those kinds of things. You know, that would call into question the reliability of the date. Here we have, you know, the date of the- So is that really it? I mean, if the board thinks that based upon the totality of the circumstances, the evidence is reliable, that's what it's going to use in relying on it or not, and when we review it, our review is whether that decision was an abuse of discretion. Correct, Your Honor. Exactly. It's the totality of the circumstances and whether it was an abuse of discretion. It's the discretion of the board to decide how to weigh these declarations. And as I'm sure Your Honors are aware, in many circumstances, we don't even have declarations. I mean, all we have are the bare documents that are submitted to us by the requester or that are found on the Internet, and the board and the examiner have to weigh the reliability of those documents. And here we have, you know, the special instance that, in addition to the documents themselves and their face being reliable, we actually have a then available witness with personal knowledge who worked for the company. So far from being a situation where we're lacking reliability and corroboration, it seems that we have a very high level of corroboration and reliability in these circumstances. Finally, with respect to the due process argument, you know, we did want to point the court to the fact that, you know, that these similar arguments have been addressed by this court on multiple occasions, both as to the applicability of the federal rules in N. Ray Epstein and also to the due process concerns articulated by Big Baboon were addressed in Abbott Labs v. Cordish. And we don't think that, you know, given the statutory construct created by Congress for these proceedings, which didn't require rules of discovery, that it would be appropriate in this instance that it's defined that there's been a constitutional violation when the office is applying the statutory construct that was given to them. Does the fact that Congress subsequently enacted the new procedures, which do allow for discovery and so forth, inform our decision as to the constitutionality of this practice? I think it does, and I think it informs it in a way that's favorable to the office, because those proceedings are contested proceedings where both, they're much more like a typical trial proceeding where you have two parties, you're using the rules of discovery. Here, it's a purely administrative proceeding with one party participating, with the expert examiner reviewing the evidence, and, you know, there isn't the same back and forth. So it's appropriate in these circumstances that those kinds of tools would not be used. Thank you. May it please the Court. I believe if the Court looks at A18576, you will find that all SAP AG gave us was an undated form letter, not addressed to anybody. We don't have a bunch of copies of sample letters sent to people. But he also says in his affidavit, this attaches a sample of the kind of thing I sent. He does, Your Honor. And, again, the key thing here is the legal conclusion of is this a publication. We're not dealing here, I don't think, with abusive process in how the Board is going about its business, but rather whether this reviewing court, looking at the issue of is this a publication as a matter of law, should properly affirm the Board when all the Board had was a rather unique declaration which says it's on hearsay. And as I said in my opening remarks, we don't know who reviewed the SAP records. We don't know. Wait a minute. He doesn't say he reviewed them, Your Honor. I'm sorry, Your Honor. He says, to prepare a shipment of SAP R3 release 3.0, I printed out a delivery note. And then he says, that's at 14 and 16, and it's attached as Appendix B is an example of a letter enlisted in materials. That's on his own personal knowledge. Yes, Your Honor. But what is not on personal knowledge is a statement of how many. Yes, Your Honor. Because what we're dealing with is not the existence of a document. Because this is not like a thesis where we assume one skilled in the art can find the thesis based on whatever indexing may be available. There might be one, there might be two, there might be three copies of 3.8. They may have been distributed, they may not have been distributed. All we have is a hearsay declaration saying that someone reviewed SAP's records in Germany and has reached these conclusions. We submit that that is not enough. That is not enough to demonstrate that this is a publication and it's this court's decision as a matter of law to decide whether a declaration like this. But you keep saying it's a matter of law, that it's an abuse of discretion standard. Well, it's an abuse of discretion as to how the board went about its business. But as I understand, maybe perhaps I'm wrong, Your Honor, I apologize, but I thought it was an issue of law whether something is or is not a publication. But if it's, well, it may be, I don't even know about that. I mean, assuming they didn't abuse of discretion in putting this in the record, then whether that supports the question of whether it's a publication is a substantial evidence review, isn't it? Whether this piece of evidence supports that conclusion. It is, Your Honor, and the question is whether this review in court thinks it's substantial evidence. I mean, I get whether something is a publication is ultimately a question of law. But if the declaration is in because we find no abuse of discretion and then this factual conclusion about whether it was transmitted or not, we review for substantial evidence that the declaration certainly supports it, then I think that gets us to agreeing with the office on the question of law. Your Honor, normally a publication is a patent or a publication where it's not an issue on review. Here we have the rather unique circumstances that the only reason we're considering this a publication. Let me ask you this. If we disagree with you about whether this should have been relied on and we assume that everything in the declaration is true, doesn't that establish that it was a publication? Yes, Your Honor. Even if it is a publication, it still does not include the integrated single database schema where all data is updated automatically in the database. What I tried to say in my remarks earlier is that R3 is a multi-tiered database and the record sites show that only part of the data goes down to the database. Most of it is stored with the clients and with the applications. So even if Your Honors decide that this is a publication, this is not the same type of database. Web-enabled certainly means something more than web front-end because the claims have to be read in light of the spec. There is a huge 70-page microfiche explaining how this interwoven single database schema worked. It can't be reasonably ignored because one reasonably skilled in the art would never read this patent as merely being a web front-end. Thank you. Thank you, Your Honor. Thank you, Judge Harding. The case is submitted.